609 So.2d 909 (1992)
Jenera MUNDY
v.
DEPARTMENT OF HEALTH AND HUMAN RESOURCES, et al.
No. 90-CA-1264.
Court of Appeal of Louisiana, Fourth Circuit.
November 13, 1992.
Writ Granted February 19, 1993.
*910 Philip H. Kennedy, Dept. of Health and Hospitals, Bureau of Legal Services, New Orleans, for appellants.
*911 Julian R. Murray, Jr., Chehardy, Sherman, Ellis, Breslin & Murray, Metairie, for appellee.
Before CIACCIO, LOBRANO and WARD, JJ.
CIACCIO, Judge.

ON REMAND FROM THE SUPREME COURT
This appeal has been remanded to this Court pursuant to the Louisiana Supreme Court's decision in Jenera Mundy v. The Department of Health and Human Resources, et al., 593 So.2d 346 (1992), for a review of the trial court's findings on the issues of negligence and quantum. The defendants, the Louisiana Department of Health and Human Resources and Charity Hospital in New Orleans, had originally appealed the trial court's judgment in favor of the plaintiff, finding Charity Hospital, plaintiff's employer, liable, in tort, for plaintiff's injuries.
This Court reversed the lower court's judgment, finding the trial court erred in holding that that plaintiff's injuries did not arise out of or occur in the course and scope of her employment.[1] The Supreme Court granted writs and reversed our judgment, finding that the defendant employer failed to meet its burden of proving entitlement to tort immunity under LSA-R.S. 23:1032.
Plaintiff filed this tort action against her employer, Charity Hospital, alleging Charity's negligence in failing to provide adequate security in the hospital and to maintain procedures for the safety of patients, visitors and employees.
The facts of this case as set forth by the Supreme Court in Jenera Mundy v. Department of Health and Human Resources, et al., supra are as follows:
Plaintiff had been employed by the Department of Health and Human Resources as a licensed practical nurse for eleven years. At the time of the incident she was working the evening shift in the dialysis department located on the eleventh floor of Charity Hospital. Evening shift employees in that department were expected to report to work at 11:15 p.m. and were considered to be late at 11:20 p.m., although the afternoon shift did not end until 11:30 p.m.
On November 13, 1986, plaintiff arrived at the hospital at approximately 11:17 p.m. and proceeded to the east elevators. She noticed that the two guards usually stationed at those elevators were not present at the time. After plaintiff entered the elevator on her way to work on the eleventh floor, a man jumped into the elevator as the doors closed and pressed the second floor button. When the elevator stopped at the second floor, the man began to leave the elevator, but turned suddenly and attacked plaintiff with a knife. Plaintiff pressed the emergency button on the elevator panel, hoping that the alarm would scare off the assailant or attract assistance. However, the button was not in working order, and the alarm did not sound. The assailant stabbed plaintiff repeatedly while standing in the elevator door before losing his balance and falling backward, allowing the doors to close. Plaintiff then sought assistance on an upper floor.
593 So.2d at 348.
Following a trial on the merits, the trial court found that Charity was negligent in the maintenance and operation of the hospital premises under LSA-C.C. art. 2315, and rendered judgment in favor of plaintiff in the amount of $125,000.00, subject to a credit of $6,338.61 for compensation benefits paid by her employer.
As to Charity's negligence, the trial court made the following findings as stated in his oral reasons for judgement:
The court further finds, as a matter of fact, that in this record, in this regard, in this situation the hospital was negligent. That the hospital owed a duty to the plaintiff to protect her as she came into *912 the hospital. It is difficult for the Court to believe that the hospital has a policy that says we will protect those persons who are departing the hospital late at night but we have no policy whatsoever to protect those who are coming into the hospital. I'm quite sure that this is the policy of the hospital but for the chief of security to make such a statement from the stand would indicate to me that at least the policy of the hospital's own security is not sufficiently strong as would affect the chief of security to the extent that he would make such an admission on the stand. I think that that statement, that admission indicated that at the time of this accident security regulations were lax, at least.
The trial judge further stated:
But this Court cannot ignore the fact or the cause as they were developed on this witness chair and the Court is convinced that in several areas the hospital was negligent. The hospital violated it's duty and that the plaintiff should not have had to run the risk of being injured in the fashion that she was injured. That she had come to rely upon the presence of a guard in the area. And that on this occasion there was no guard in the area. But I would like to underscore the Court's finding that she could not possibly have contemplated any injury at the time that she got on the elevator because the testimony of Miss Mundy, uncontradicted, was that the assailant got on the elevator at the very last moment and she did not know that she was in any danger until such time as the assailant had pushed the button to stop on the second floor and the elevator had come to a stop on that second floor and the doors were about to open or had opened.
For all of these reasons the Court finds that the defendant Charity Hospital has been negligent and that under 2315 the plaintiff is entitled to recover as follows:
Louisiana courts employ a duty/risk analysis to determine what constitutes actionable negligence in a tort suit. See, e.g.: Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984); Shelton v. Aetna Casualty & Surety Co., 334 So.2d 406 (La.1976). In order to prevail in a negligence action under the duty/risk analysis, plaintiff must prove (1) that the defendant owed a duty of care to the plaintiff; (2) that the defendant breached the duty; (3) that the breach was a cause-in-fact of the harm; (4) that the risk and harm encountered by the plaintiff falls within the scope of the protection afforded by the duty breached (proximate cause). Harris v. Pizza Hut of Louisiana, Inc., supra, 455 So.2d at 1370. Duty is a question of law. Id. at 1371. Whether a defendant has breached a duty owed is a question of fact. Annis v. Shapiro, 517 So.2d 1237 (La.App. 4th Cir.1987).
In general, owners and occupiers of land have a duty to refrain from acting negligently toward those they know will come onto their property. The proper test is "whether in the management of his property he has acted as a reasonable man in view of the probability of injury to others..." Cates v. Beauregard, 328 So.2d 367 (La.1976); Shelton v. Aetna, supra; Barcia v. Estate of Keil, 413 So.2d 241 (La. App. 4th Cir.1982). The duty is not to insure against the possibility of an accident, but to act reasonable. Id. at 243. Thus, the landowner has a duty to discover any unreasonably dangerous conditions on the premises and to either correct the conditions or warn of the danger. Shelton v. Aetna, supra, 334 So.2d at 410; Malcolm Sutter v. Audubon Park Commission, 533 So.2d 1226 (La.App. 4th Cir.1988), writ denied 538 So.2d 597 (La.1989).
In the same respect, a business establishment is under a duty to take reasonable care for the safety of its patrons, but it is not the insurer of their safety. Phillips v. Equitable Life Assurance Company of the United States, 413 So.2d 696 (La.App. 4th Cir.1982), writ denied 420 So.2d 164 (La.1982); Coblentz v. North Peters Parking, Inc., 533 So.2d 98 (La.App. 4th Cir.1988). This duty does not extend to unforeseeable or unanticipated criminal acts by independent third persons. Only when the owner, management or employees of a business have or should have *913 knowledge of a third person's intended injurious conduct that is about to occur and which is within the power of the owner, management or employees to protect against, does the duty arise. Banks v. Hyatt Corp., 722 F.2d 214 (5th Cir.1984); Rodriguez v. New Orleans Public Service, Inc., 400 So.2d 884 (La.1981); Davenport v. Nixon, 434 So.2d 1203 (La.App. 1st Cir. 1983).
Plaintiff offered her own testimony to prove that Charity Hospital failed to provide a safe environment for employees, patients and visitors and failed to provide adequate security. At trial plaintiff testified that she had worked the night shift, 11:15 p.m. to 7:15 a.m. for ten years and that she usually entered the hospital through the pediatric emergency room and used the east bank elevators in the lobby to go to her work station on the eleventh floor. She testified that both employees and the general public used the east bank elevators and that ordinarily two security guards were stationed in the lobby near the elevators. According to plaintiff, the security guards were always stationed at that location but on the night of the attack, they were not there.
Other than her own testimony, plaintiff offered no other evidence to prove that the elevators at Charity Hospital posed an unreasonable danger to hospital employees, visitors and patients or that the hospital's security was inadequate. Although she had used the east bank elevators each night she had reported for duty during the preceding 10 years, she did not testify that any other incident had occurred on these elevators involving herself or any other employee, patient or visitor. She did not produce any testimony by any other employee of the hospital nor did she produce any police records of any prior assault in the area of these elevators.
The defense presented the testimony of Robert Coleman, hospital police captain in charge of night security. Captain Coleman testified that he had been employed in night security at the hospital for fifteen years. According to him, at the time of plaintiff's attack in November, 1986, there were about 25 persons employed in night security and that they were responsible for security for the entire Charity Hospital facility which included sixteen buildings.
Coleman testified that the security personnel patrolled both the inside and outside of the hospital and that there were certain posts throughout the facility where guards were stationed on a regular basis such as the emergency room and psychiatric ward of the hospital. He further testified that at the time of the incident the east bank elevators were not considered a regular night security post but that he would often place one or two guards there when security had personnel available, usually two or three nights a week. According to Coleman, security personnel routinely patrolled the floors of the hospital including the lobby area by the elevators and after visiting hours were over would escort persons out of the hospital. He testified that security routinely checked persons dressed in hospital gowns walking on the floors for hospital identification bands and visitors for visitor passes. He also stated that security would patrol the areas near the elevators during employee shift changes, as approximately 1500 to 2500 employees would enter and exit the hospital at these times. Coleman testified that hospital security provided an escort service for those employees leaving the hospital at night but not for those entering. The employee would call security at the end of the shift and a guard would escort the employee to his (her) car located in one of the parking lots or garages near the hospital.
As to his knowledge of prior criminal assaults at Charity Hospital, Coleman testified that he knew that on a few occasions there were incidents that had occurred in the emergency room where a patient or someone accompanying a patient had hit a nurse or doctor but that he had no knowledge of any criminal acts in or near the elevators. He stated that because of the prior incidents in the emergency room, guards were always posted there.
According to Coleman, the public telephones were near the east bank elevators and that it was not uncommon for persons *914 waiting in the hospital emergency room waiting area to use those telephones, however, he had no knowledge that anyone had ever been assaulted in the area or that it had posed a threat to hospital employees, patients or visitors in the absence of stationed guards.
It is well settled that under a duty/risk analysis, the plaintiff bears the burden of proving by a preponderance of the evidence that the defendant violated an imposed duty and acted unreasonably causing injury to plaintiff. Blanchard v. Riley Stoker Corp., 492 So.2d 1236 (La.App. 4th Cir.1986). Further, factual conclusions of the trial court are entitled to great weight as the trial court is in a better position to evaluate the credibility of witnesses, and an appellate court should not disturb those conclusions unless they are clearly erroneous. Arceneaux v. Dominque, 365 So.2d 1330 (La.1978), Canter v. Koehring Co., 283 So.2d 716 (La.1973). After reviewing the record, we find the trial judge's conclusions and findings to be manifestly erroneous.

DUTY
In his reasons for judgment the trial judge predicated the negligence of the hospital on "a duty to the plaintiff to protect her as she came into the hospital," reasoning that such a duty should flow from the hospital's practice of furnishing an escort service in the late hours to employees who were returning to nearby parking sites. Aside from the practical impossibility of escorting hundreds of employees arriving from various bus stops, parking lots and other locations to their duty stations, as a matter of law, the trial judge erred in finding the existence of this duty.
On remand, the Supreme Court held that the risk which gave rise to plaintiff's injury was not greater for plaintiff than for a person not so employed. It further held that the risk which gave rise to the injury was a neutral risk that was not related either to plaintiff's employment or her personal life. It also found that she was in the public area of the building open to the public, on an elevator used by patients and visitors as well as employees, and that she had not yet reached the place where she would be under the supervision and control of her employer. Finally, the Supreme Court found that the threshold doctrine did not apply because the risk was no more dangerous in the immediate vicinity of the employer's premises than elsewhere along her route of travel to work. Jenera Mundy v. The Department of Health and Human Resources, et al, supra, 593 So.2d at 350-51.
Accordingly, the trial judge erred in defining a risk resulting from plaintiff's status as an employeeif the injury had resulted from such a risk, it would not have been compensable in tort. LSA-R.S. 23:1032.
Following the supreme court's logic, plaintiff was subjected only to those risks applicable to a non-employee of the hospital, i.e., a member of the general public visiting the hospital and using the elevator to get to an upper floor.
Assuming that the hospital owed some general duty to provide security for the general public there was no showing that the hospital was negligent in its security operations.
Even accepting plaintiff's testimony as completely true, as the trial judge did, there is no evidence that Charity Hospital knew or should have known that the elevators in the lobby area posed an unreasonable risk of harm to employees, visitors or patients such that the hospital had a duty to provide stationed security guards outside the elevators on a permanent basis or the duty to station security guards inside the elevators.

SECURITY
Plaintiff failed to introduce any evidence to prove that Charity Hospital had notice of prior violent crimes in the area of the elevators or on the elevators to prove the reasonable foreseeability of such an attack occurring on the elevator. Although plaintiff stresses in her brief that Coleman had testified at trial that many of the hospital's *915 security records were discarded after a year, the record does not show that plaintiff ever attempted to subpoena the records of prior criminal acts in or around Charity Hospital from either the defendants or the New Orleans Police Department.
Likewise, plaintiff failed to introduce any expert testimony to prove that the security measures followed by Charity were deficient or fell below the standard normally required of hospitals of its size and complexity. The mere testimony of plaintiff coupled with the single criminal incident do not suffice to sustain her burden of proving that Charity was negligent in providing adequate security to the general public.
Under the facts of this case, we do not find that the risk of criminal assault in the elevators at Charity Hospital was sufficient to impose a duty upon defendants to employ permanent security guards in the elevators or in the lobby near the elevators. Further, the mere fact that defendants placed permanent security guards in the emergency room and psychiatric ward of the hospital or that it employed a security force is not sufficient to show that the hospital premises was unreasonably dangerous such that the defendants had a duty to place permanent security guards in other areas of the hospital.
The trial court found that plaintiff could not have contemplated any injury when she got on the elevator and that she did not know she was in any danger until the elevator stopped on the second floor and the assailant, without warning, suddenly began stabbing her. We agree that plaintiff's stabbing was a random, unforeseeable criminal attack that happened in a matter of seconds without the assailant's identity or motive ever being established. As such we cannot say that it could have been prevented by any security measure other than the permanent posting of a guard inside this elevator and within all of the elevators of Charity Hospital. Prior history did not require Charity Hospital to implement such a drastic security measure, and its failure to do so was not negligent.
For the foregoing reasons, we find the trial judge was clearly wrong in concluding that Charity Hospital had a legal duty to anticipate the attack on plaintiff and a duty to provide special security measures to prevent such an act. As we find that defendants had no legal duty, we do not reach the question of whether defendants breached a duty. In view of this holding, we need not address the issue of damages.
Accordingly, we reverse the judgment of the trial court and render judgment in favor of defendants, Charity Hospital and the State of Louisiana, Department of Health and Hospitals.
REVERSED.
NOTES
[1] Jenera Mundy v. The Department of Health and Human Resources, et al., 580 So.2d 493 (La.App. 4th Cir.1991).